DOLAN v CONTINENTAL AIRLINES/CONTINENTAL EXPRESS

Docket No. 102413. Argued January 16, 1997 (Calendar No. 19). Decided May 20, 1997.

Sue Ann Dolan brought an action in the Wayne Circuit Court against Continental Express, alleging wrongful discharge from employment in violation of Michigan's Whistleblowers' Protection Act, MCL 15.362; MSA 17.428(2), breach of contract principles, and public policy. The plaintiff had been asked to be alert to and to report to the Federal Drug Enforcement Agency persons purchasing tickets or otherwise contacting the airline who fit a designated profile description relating to drug trafficking or terrorist activities. Later, her employer posted a notice directing employees to seek management approval before making such reports. The plaintiff was discharged after her employer was informed that she made another report without management approval. The court, William J. Giovan, J., granted summary judgment for the defendant. The Court of Appeals, TAYLOR, J. (R. D. GOTHAM, J., concurring in the result only), and (SHEPHERD, P.J., not participating), affirmed (Docket No. 149512). The plaintiff appeals.

In a unanimous opinion by Justice BOYLE, the Supreme Court *held*:

The plaintiff stated a valid claim of wrongful discharge from employment under the Whistleblowers' Protection Act.

1. Employees who report violations or suspected violations of law by either their employers or fellow employees to a public body are entitled to protection under the Whistleblowers' Protection Act. The plaintiff alleges she was fired because she reported or was believed to have reported a violation of law. The allegation is sufficient to state a claim of wrongful discharge under the act. In addition, the reported violation was sufficiently related to the employment setting to be protected under the act. The trial court erred in granting the defendant's motion for summary disposition of the WPA claim. Because the WPA is the exclusive remedy against such discharge, the grant of summary disposition of the public policy claim was proper.

2. The plaintiff had no legitimate expectation of continued employment as a matter of law on the basis of the defendant's writ-

ten disciplinary policies alone. Nor could an inference be drawn that the relationship between the parties was a contract for termination only for good cause.

Affirmed in part, reversed in part, and remanded for further proceedings.

208 Mich App 316; 526 NW2d 922 (1995) affirmed in part and reversed in part.

*Cunningham & Associates* (by *Douglas C. Cunningham*) for the plaintiff.

*Miller, Canfield, Paddock & Stone* (by *Megan P. Norris*) for the defendant.

BOYLE, J.

I

In this case we are asked to determine whether plaintiff has stated a valid claim of wrongful discharge from employment under Michigan's Whistleblowers' Protection Act (WPA),[1] breach of contract principles, and public policy. For the reasons that follow, we hold that plaintiff has failed to state a claim of wrongful discharge from employment under public policy and breach of contract principles, but has stated a valid claim under the WPA. Accordingly, we affirm the grant of summary disposition as it relates to the public policy and breach of contract claims, and reverse and remand for further proceedings on the WPA claim.

II

Plaintiff worked as a ticketing agent for defendant airlines[2] at the Capitol City Airport in Lansing, Michi-

---

[1] MCL 15.362; MSA 17.428(2).

[2] The named defendant was Continental Airlines/Continental Express, a Delaware corporation. Defendant has informed this Court that no such

gan. In early 1991, as a means of tightening airport security during the Persian Gulf War, plaintiff and her colleagues were asked to stay alert to individuals purchasing tickets or otherwise contacting the airline who fit a designated profile description relating to drug trafficking or terrorist activities. Plaintiff did just that and, in January or February, 1991, she and a co-worker informed airport security of individuals who fit the profile description. On the basis of plaintiff's tip, the Federal Drug Enforcement Agency intervened and made an arrest. Shortly thereafter, plaintiff again contacted the authorities to report yet another individual whom she believed fit the designated profile. The DEA assured plaintiff that she would be rewarded.

On February 10, 1991, the general manager of Continental Express posted a written notice directing employees to seek management approval before contacting authorities to report individuals believed to fit the profile description.[3] One month later, plaintiff was approached by the general manager and asked if she had contacted the DEA after February 10, 1991. Plaintiff claimed that she had not, but was sent home pending an investigation.

---

corporation exists. Instead, according to defendant, plaintiff was employed by Britt Airways, Inc., doing business as Continental Express. Britt Airways, Inc., a Delaware corporation, is a wholly owned, but independent, subsidiary of Continental Airlines, Inc. For purposes of this opinion, defendant will be referred to as Continental Express.

[3] The posted notice stated:

> From Feb 10th on you must have my OK to call D.E.A. officials on any person or persons suspected of drug trafficing [sic]. If you cannot get ahold of me, you should . . . write down . . . why you feel this way, then place this in a sealed envelope in my mailbox. There are no exceptions.

According to plaintiff, Continental's investigation unearthed two individuals who agreed to provide written statements indicating that plaintiff had reported two passenger names to the DEA after February 10, 1991. When confronted, plaintiff admitted that she contacted the DEA after the February date, but insisted that she did so only because she wanted information on the status of her reward. Plaintiff contends that she did not report passenger names after the February 10 posting.

In March, 1991, the general manager of Continental Express contacted the plaintiff and told her that her relationship with Continental was over. The next day, plaintiff was shown one of two written statements that alleged that she had contacted the DEA without Continental Express' approval after February 10, 1991.[4] Plaintiff was told that corporate headquarters would make the final determination on her employment status. Subsequently, plaintiff's employment was terminated.[5]

Plaintiff's original complaint alleged wrongful discharge from employment under the Michigan Whistleblowers' Protection Act and breach of contract principles. The circuit court granted defendant's motion for summary disposition on the WPA claim.[6]

---

[4] According to the pleadings, the written statements alleged that plaintiff contacted the DEA on March 13, 1991, and provided them with two passenger names.

[5] Plaintiff alleges that further discussions occurred between plaintiff and Continental Express after the general manager told plaintiff that it was "over" and before plaintiff's employment officially ended.

[6] The order was entered on October 10, 1991. The trial court held:

   [T]he defendant may have been wrong in its assessment of her activity, but that's not the point of the motion. The point of the motion is that it goes to a discharge based on particular kind of a

Shortly thereafter, plaintiff filed an amended complaint, adding a new charge of wrongful discharge from employment in violation of public policy. Defendant again sought dismissal of plaintiff's claims under MCR 2.116(C)(8). At the same time, plaintiff filed a motion for relief from the October 10, 1991, order granting defendant summary disposition on the WPA claim. After consolidating the matters, the court granted defendant's motion to dismiss plaintiff's first amended complaint with prejudice and denied plaintiff's motion for relief from the October 10, 1991, order. The Court of Appeals affirmed. We granted leave to appeal. 452 Mich 867 (1996).

III

Plaintiff alleges that the court dismissed the WPA claim on the basis of a faulty interpretation of the law. According to plaintiff, the December 16, 1991, decision in *Dudewicz v Norris Schmid, Inc*, 192 Mich App 247, 254; 480 NW2d 612, aff'd in part and rev'd in part 443 Mich 68; 503 NW2d 645 (1993), extended the application of the act and required that the court grant relief from its earlier order dismissing the whistleblowers' claim.

In considering plaintiff's motion for relief from that order, the circuit court reviewed the whistleblowers' claim in light of the Court of Appeals opinion in *Dudewicz* and determined that the grant of summary disposition had been appropriate. On appeal, the

motivation and the motivation forbidden by the statute is that of vindictiveness or revenge for action taken by the employee which is aimed at reporting illegal activity by the employer which is clearly not involved here, for precisely the reasons stated in the defendant's motion. And the motion is granted.

Court of Appeals, having the benefit of this Court's analysis in *Dudewicz*, reduced the instant issue to whether the WPA was intended to protect "third parties whose violations, if any, have no connection to the business." 208 Mich App 316, 318-319; 526 NW2d 922 (1995). The Court of Appeals found that the act did not apply, stating that "in order for the WPA to apply, the violation or suspected violation must be committed in the course of doing business." *Id.* at 320.

IV

Michigan's Whistleblowers' Protection Act was first enacted in 1981, largely in response to the accidental PBB-contamination of livestock feed.[7] The act "encourage[s] employees to assist in law enforcement and . . . protect[s] those employees who engage in whistleblowing activities."[8] It does so with an eye toward promoting public health and safety. The underlying purpose of the act is protection of the public.[9] The act meets this objective by protecting the

---

[7] *Dudewicz, supra*, 443 Mich 82-83 (BOYLE, J., dissenting) (employees of the chemical company that mistakenly substituted poisonous fire retardant for nutritional supplements were warned not to volunteer information of the mistake to investigators or else they would be fired). See also Culp, *Whistleblowers: Corporate anarchists or heroes? Towards a judicial perspective*, 13 Hofstra Lab L J 109, 129 (1995) (Michigan was the first jurisdiction to provide general statutory protection for the whistleblower), and Barcia, *Update on Michigan's Whistleblowers' Protection Act*, 1988 Det C L R 1, 2.

[8] *Dudewicz*, 443 Mich 83 (BOYLE, J., dissenting).

[9] The legislative analysis of the Whistleblowers' Protection Act provides:

Violations of the law by corporations or by governments and by the men and women who have the power to manage them are among the greatest threats to the *public welfare.* . . . Because these institutions are large and impersonal, and because they are regulated by complex and, to most people, unfamiliar statutes and

whistleblowing employee[10] and by removing barriers that may interdict employee efforts to report violations or suspected violations of the law. Without employees who are willing to risk adverse employment consequences as a result of whistleblowing activities, the public would remain unaware of large-scale and potentially dangerous abuses.[11]

To establish a prima facie case under the WPA, plaintiff must prove that she "report[ed] or [was] about to report . . . a violation or a suspected violation of a law . . . to a public body." MCL 15.362; MSA 17.428(2).[12] Plaintiff asserts that she was termi-

---

rules, specific violations of the law by them often go unnoticed by the public *which is the victim*. [House Legislative Analysis, HB 5088, 5089, February 5, 1981 (emphasis added).]

[10] One commentator categorizes whistleblowers into three distinct groups:

[Group 1: Passive Whistleblowers—]employees who do nothing more than respond to lawful requests for information from governmental authorities. [Also included are those] employees who refuse to carry out illegal instructions, but who do not publicly disclose such instructions [to others].

[Group 2: Active Whistleblowers—]employees who voice their concerns regarding their employers' illegal behavior, either internally or externally. . . . [This group] include[s] employees who take affirmative steps to oppose their employers' conduct within the confines of their employers' organizations, in addition · to employees who report illegal practices to persons outside of their employers' organizations.

· [Group 3: Embryonic Whistleblowers—]employees who are terminated before they have the opportunity to oppose their employers' practices, ostensibly because their employers suspected that such employees harbored an intent to actively oppose illegal practices. [Westman, *Whistleblowing: The Law of Retaliatory Discharge*, pp 19-20.]

[11] House Legislative Analysis, n 9 *supra*.

[12] The Whistleblowers' Protection Act provides:

nated "because [she] reported and/or was perceived to report a violation or a suspected violation of a law . . . ."[13] Because plaintiff appeals from a motion granting summary disposition, all factual allegations supporting her claims must be accepted as true.

V

A motion for summary disposition under MCR 2.116(C)(8), tests the legal basis of the claim and is granted if the claim is so manifestly unenforceable as a matter of law that no factual progression could possibly support recovery. *Simko v Blake*, 448 Mich 648, 654; 532 NW2d 842 (1995). Motions for summary disposition are examined on the pleadings alone, absent consideration of supporting affidavits, depositions, admissions, or other documentary evidence, and all

---

An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee . . . reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state . . . to a public body . . . . [MCL 15.362; MSA 17.428(2).]

[13] Plaintiff contends that she was fired because she reported or was believed to have reported a violation or suspected violation of the law. At the same time, plaintiff admits that she did not report a violation or suspected violation when she contacted the DEA after February 10, 1991. Additionally, no allegations were made that plaintiff was about to report a violation or suspected violation of the law.

Despite the fact that no reports were made after February 10, plaintiff alleged that defendant believed she made additional reports and she was fired for doing so. Plaintiff asserts that any communication she had with the DEA after February 10, 1991, involved a continuation of the initial protected activity. Thus, any telephone call plaintiff made to the DEA after February 10, 1991, constituted potentially protected activity in that it was a continuation of the contact that occurred before the February 10 posting. Plaintiff's position is that the employer may not make such activity the basis of unfavorable or adverse employment decisions.

factual allegations contained in the complaint must be accepted as true. *Id.* at 654.

VI

The pivotal question in this case is whether the plaintiff stated a valid claim of wrongful discharge from employment under the WPA where she alleged that she reported or was perceived to report a violation or suspected violation of the law. We find that she did.[14]

A plain reading of the WPA reveals that employees who report violations or suspected violations of the law to a public body are entitled to protection under the act. As interpreted, the act provides protection to employees who report violations of law by either their employers or fellow employees. *Dudewicz*, 443 Mich 68. The act was intended to protect employees who alert the public to "corruption or criminally irresponsible behavior in the conduct of government or large businesses."[15] *Id.* at 75. Frequently, a close connection exists between the reported violation and the employment setting, although no such limitation is found in the statute. *Id.*

In *Dudewicz*, the plaintiff worked as a parts manager for the defendant automobile dealership. In an effort to gain better service for a customer, the plaintiff, along with the dealership's owner, convinced the service manager to perform work for the customer under warranty. After the owner left the area, the ser-

---

[14] This conclusion is predicated on the characterization of plaintiff's argument as a "continuing violation." See n 13. We do not reach the question whether a perceived whistleblower is entitled to protection under the WPA. *Chandler v Dowell Schlumberger*, 214 Mich App 111; 542 NW2d 310 (1995).

[15] House Legislative Analysis, n 9 *supra*.

vice manager allegedly assaulted the plaintiff. The plaintiff was fired when he refused to drop criminal charges against the service manager. A majority of this Court afforded the plaintiff protection under the WPA. While acknowledging that the connection between the violation and the employment setting was slightly more attenuated than "traditional notions of whistleblowing,"[16] the majority found that the violation was "very much within the employer-employee setting."[17]

In light of the approach taken in *Dudewicz*, we decline to limit application of the WPA to reported violations of the employer alone. In accordance with the plain language of the act, plaintiff has alleged that she was fired because she reported or was believed to have reported a violation of the law. This allegation is sufficient to state a claim of wrongful discharge from employment under the WPA. In addition, we find that the reported violation in the present case was sufficiently related to the employment setting to be protected under the WPA. This is not to say that only those violations that are connected to the employment setting are contemplated under the WPA, only that the reported violation in the present case was sufficiently connected to the employment setting to be contemplated under the majority opinion in *Dudewicz*.[18]

---

[16] *Dudewicz, supra,* 443 Mich 75.

[17] *Id.* at 78.

[18] The *Dudewicz* majority noted that the violation arose out of a dispute over the handling of company business that occurred on company premises during business hours. *Id.* at 80. In the present case, reports were made on company premises during business hours. The very fact that a corporate directive was set in order, dictating the manner and

Accordingly, we find that the trial court erred in granting the defendant's motion for summary disposition on the WPA claim. Because the WPA is the exclusive remedy against discharge in retaliation for the conduct at issue, the grant of the motion for summary disposition on the public policy claim is affirmed. *Id.* at 80.

VII

Lastly, plaintiff alleges that the defendant maintained written policies that gave rise to an express or implied contract of continued employment and a legitimate expectation that the plaintiff would not be terminated in a manner contrary to those policies. Both the circuit court and the Court of Appeals held that, as a matter of law, on the basis of defendant's written disciplinary policies alone, plaintiff had no legitimate expectation of continued employment, nor could an inference be drawn that the relationship between the parties was a contract for termination for good cause only. We agree.

It is a settled tenet of Michigan law that employment contracts for an indefinite term produce a presumption of employment at will absent distinguishing features to the contrary. *Toussaint v Blue Cross & Blue Shield of Michigan*, 408 Mich 579; 292 NW2d 880 (1980). To overcome this presumption, evidence may be produced that proves the existence of an express contract for a definite term or an express provision in a contract that forbids termination absent just cause. Proof of a promise of job security implied in fact, such as employment for a particular term or a prom-

---

method by which reports to the DEA could be made, provides strong evidence that the violation was connected to the employment setting.

ise to terminate only for just cause, may also overcome the presumption. *Rowe v Montgomery Ward & Co, Inc*, 437 Mich 627; 473 NW2d 268 (1991). Furthermore, company policies and procedures may become an enforceable part of an employment relationship if such policies and procedures instill legitimate expectations of job security in employees. *Rood v General Dynamics Corp*, 444 Mich 107, 117-118; 507 NW2d 591 (1993). This presumption does not prevent proof of actual intent, nor should it sanction unjustified evasions of promissory liability.[19]

A

Plaintiff does not allege that the defendant orally promised that her employment would continue indefinitely absent just cause for termination. Instead, she alleges that the defendant's Human Resources Policy Manual incorporated written policies that established a progressive disciplinary system whereby plaintiff could be terminated only for cause. It is by virtue of these policies that plaintiff contends that an express or implied contract of employment arose and that a legitimate expectation was created that plaintiff would not be disciplined or terminated in a manner contrary to those stated policies.[20]

In *Toussaint, supra* at 610, this Court acknowledged that written statements in a company policy and procedure manual could give rise to enforceable rights in contract or to a legitimate expectation of

---

[19] *Rowe, supra* at 676, n 14 (BOYLE, J., concurring).

[20] Plaintiff specifically alleges that she had a "reasonable and legitimate expectation that she wold [sic] not be involuntarily terminated from employment with the Defendant, or disciplined, in a manner contrary to the policies evidenced by [the policy manual]."

just-cause employ-ment.[21] In *Renny v Port Huron Hosp*, 427 Mich 415; 398 NW2d 327 (1986), that same idea found expression when the Court held that an employee handbook could provide the basis of a just-cause employment contract. Later, in *Rood*, this Court once again considered whether written policy statements provided the basis for an employment agreement terminable only for cause. The Court opined that where policy manuals are distributed throughout the company

> our inquiry is not limited to the question whether the employer sufficiently manifested an intention to enter a single contractual just-cause employment relationship with the party before the Court, but, rather whether the employer has sufficiently manifested an intention to enter such a relationship with all employees subject to the relevant policies and practices. [*Id.* at 136.][22]

---

[21] *Toussaint* held:

> Since Blue Cross published and distributed a 260-page manual establishing elaborate procedures promising "[t]o provide for the administration of fair, consistent and reasonable corrective discipline" and "to treat employees leaving Blue Cross in a fair and consistent manner and to release employees for just cause only," its employees could justifiably rely on those expressions and conduct themselves accordingly. [*Id.* at 617.]

[22] The Court held:

> [A] finding that the employee policy of discharge for cause contained in the GDLS employee handbooks became a part of Dr. Rood's employment contract would necessarily constitute a finding that it became a part of the employment contract of every manager who had been employed at GDLS when the handbooks were in effect. Such a commitment should not be lightly inferred. [*Id.* at 136-137.]

According to the Court in *Rood*, the mere dissemination of an employee handbook that implied a discharge-for-cause policy was insufficient *as a matter of law* to state a cause of action for breach of contract. Policies such as these "may become part of an employment contract only when the circumstances (e.g., the language in the handbook itself, or an employer's oral statements or conduct) clearly and unambiguously indicate that the parties so intended." *Id.* at 137.

Plaintiff alleges that she was wrongfully terminated from her employment contrary to defendant's written policy statements that expressly or impliedly formed the basis of her employment agreement with the defendant. Plaintiff acknowledges that defendant's policies were not unique to her, but were applicable to all the defendant's employees. Absent allegations in the pleadings that clearly and unambiguously indicate the defendant's intent to create a just-cause employment relationship with all its employees, or in particular with this plaintiff, we hold that plaintiff has not, as a matter of law, stated a claim on which relief can be granted.

B

Plaintiff next contends that she had a legitimate expectation that she would not be terminated, or otherwise disciplined, in a manner contrary to the policies set forth in the defendant's policy and procedure manual. In other words, plaintiff contends that she had a legitimate expectation of just-cause employment.

The legitimate-expectations prong of *Toussaint* was founded on this Court's common-law authority to rec-

ognize enforceable obligations that arise outside the scope of normal contract principles.[23] The theory operates as a viable, independent basis for enforcing promises of job security contained in policy statements that are circulated "either 'to the work force in general or to specific classifications of the work force, rather than to an individual employee.' "[24] Having announced its policy, and presumably having been benefited by that policy, the employer may not then treat it as illusory.[25] Employer policy statements that are "reasonably capable of being interpreted" as promises to discharge for just cause only, or that are capable of two reasonable interpretations, create an issue of fact for the jury.[26]

Defendant's policy manual states that its progressive disciplinary action plan "allows an employee the opportunity to make necessary corrections in their performance." It also establishes that discipline "should be used only when other efforts have failed or if the violation in question precludes other alternatives." Additionally, the manual states that "[t]he supervisor must investigate early and thoroughly to be fair as well as to prepare for possible testimony that just cause existed for disciplinary action."

Defendant's disciplinary policies also expressly indicate, however, that certain situations may require more severe action than that detailed in the policy manual. In situations where the appropriate disciplinary action is not designated in the manual, the

---

[23] *Rood, supra* at 118.

[24] *Id.* at 138, quoting *In re Certified Question*, 432 Mich 438, 443, n 3; 443 NW2d 112 (1989).

[25] See *id.* at 454-455.

[26] *Rood, supra* at 140.

supervisor is not precluded from taking the necessary action, but is required to contact the Human Resource Department to "discuss the proper approach." Particularly relevant are defendant's policies on involuntary terminations. Although the policies indicate that "[e]very effort will be made to improve employee performance and correct deficiencies to avoid termination of employment," they also state that "[w]ith the exception of serious infractions, an employee will be given the opportunity to correct deficiencies."

Infractions serious enough to require automatic termination are listed in the policy manual. Also listed are those infractions that may warrant dismissal on the first offense. Infractions resulting in possible first offense termination include "[r]efusing to follow directions from supervisors or showing gross insubordination." The policy and procedure manual expressly states that the listed offenses are only "examples of common offenses for which employees may be terminated for cause" and is not an all-inclusive list.[27] As this Court held in *Rood, supra*, "[a] nonexclusive list of common-sense rules of behavior that can lead to disciplinary action or discharge, clearly reserves the right of an employer to discharge an employee at will."[28] Accordingly, the grant of summary disposition on plaintiff's breach of contract claim is affirmed.[29]

---

[27] See *Hale v Comerica Bank*, 189 Mich App 382; 473 NW2d 725 (1991).

[28] *Rood, supra* at 142.

[29] See also *Biggs v Hilton Hotel Corp*, 194 Mich App 239; 486 NW2d 61 (1992) (the fact that the defendant had established a disciplinary system for its employees and, apparently, obligated the plaintiff to abide by that disciplinary system in dealing with his subordinates does not establish unequivocally the plaintiff's position that he was a just-cause employee rather than an employee at will); *Stopczynski v Ford Motor Co*, 200 Mich

VIII

For these reasons, we affirm the grant of summary disposition on plaintiff's public policy and breach of contract claims, and reverse the grant of summary disposition on plaintiff's WPA claim. We remand this claim to the trial court for further proceedings consistent with this opinion.

MALLETT, C.J., and BRICKLEY, CAVANAGH, RILEY, WEAVER, and KELLY, JJ., concurred with BOYLE, J.

---

App 190; 503 NW2d 912 (1993) (by simply adopting disciplinary procedures applicable to the plaintiff, the defendant did not alter the at-will relationship); *Brocklehurst v PPG Industries, Inc*, 836 F Supp 1354, 1360 (ED Mich, 1993) (a listing of prohibited conduct is simply not enough to overcome the presumption of employment at will).